UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
AGILITY PUBLIC WAREHOUSING CO.       :
K.S.C., et al.,                      :
                                     :
                Petitioners,         :
     - against -                     :
                                     :
SUPREME FOODSERVICE GmbH,            :
                                     :
                Respondent.          :
----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/29/11

11 Civ. 7375

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

On October 18, 2011, petitioners Agility Public Warehousing Co. K.S.C. ("PWC") and Professional Contract Administrators, Inc. ("PCA") (together, "PWC/PCA") petitioned the Court (Docket No. 1) to confirm partial and final arbitration awards (together, the "Award") against respondent Supreme Foodservice GmbH ("Supreme"). A panel of three arbitrators (the "Tribunal") under the auspices of the American Arbitration Association ("AAA") International Centre for Dispute Resolution issued the Partial Final Award on April 26, 2011, and the Final Award and August 25, 2011. (See Docket No. 17, ex. 1A, 1B.) Supreme cross-petitioned to vacate the Award on November 4, 2011 (Docket No. 18).1 Supreme argues for vacatur of the Award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 1958, 9 U.S.C. §§ 201-08, 21

U.S.T. 2517 (the "Convention") and the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1-16.[1]

In an Order dated December 19, 2011, the Court confirmed the Award and denied Supreme's motion to vacate (Docket No. 31). The Court now sets forth its findings, reasoning, and conclusions in support of the December 19, 2011 Order below.

## I.   BACKGROUND[2]

### A.   THE SERVICES AGREEMENT AND SIDE AGREEMENT

The arbitration at issue derives from agreements between the parties related to the supply of food to American troops in Afghanistan. On October 25, 2004, PWC/PCA and Supreme Foodservice AG, a subsidiary of Supreme, executed an agreement (the "Services Agreement") whereby Supreme, with the assistance of PWC/PCA, would enter a bid (the "Solicitation") with the United States government to win the prime vendor contract supplying food to United States forces in Afghanistan, also known as "Zone 3." At the time of the negotiation of the Services

---

[1] The FAA incorporates the Convention. See Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 405 (2d Cir. 2009).

[2] The facts below are taken from the parties' submissions, including Supreme's Memorandum of Law in Support of Motion to Vacate the Arbitral Award (Docket No. 16), the Final Award (Docket 17, ex. 1A), the Partial Final Award (Docket 17, Ex. 1B) and the Services Agreement (Docket 17, Ex. 2). Except where specifically referenced, no further citation to these sources will be made.

Agreement, PWC operated as the prime vendor supplying food and related supplies to troops in "Zone 1," including Iraq, Kuwait, and Jordan. PCA provided advice and counseling to food supply contractors, including PWC.

Under the Services Agreement, PWC/PCA's assistance to Supreme included providing food prices and supply chains for use in the Solicitation. In the event that Supreme won the prime vendor contract, the Services Agreement provided that Supreme would pay PWC/PCA a "Monthly Service Fee" equal to 3.5% of "Net Revenues," as therein defined. The Services Agreement also provided that Supreme would continue to pay PWC/PCA 1.75% of "Net Revenues" after termination of the Services Agreement ("Post-Termination Fees") for the life of the prime vendor contract.

On June 3, 2005, Supreme won the prime vendor contract for Afghanistan. As the war in Afghanistan expanded beyond the geographical range anticipated by the Solicitation and the Services Agreement,[3] the United States government requested that Supreme expand services to additional

---

[3] Appendix A to the Services Agreement specifies the scope of the services which PWC/PCA agreed to perform. The scope of those services depends in part on the Solicitation and the terms of the prime vendor contract. (Docket No. 17, ex. 2 at 13-17.)   For example, the PWC/PCA agreed to "assist [Supreme] in obtaining market basket pricing for the bid," and to "provide product sources, prices and purchasing conditions to [Supreme] for all items required under the Prime Vendor Contract." Thus, the terms of the Solicitation and the resulting prime vendor contract might affect performance of the Services Agreement.

3

"Forward Operating Bases."   On May 15, 2006, Stephen Orenstein, the chief principal executive officer of Supreme, and Toby Switzer, general manager of PWC's Prime Vendor Program, exchanged emails regarding whether PWC/PCA should be compensated for this expanded service – in particular, transportation into and out of Afghanistan.   In what became known as the "Side Agreement," Orenstein and Switzer agreed that Supreme would pay PWC/PCA fees equal to 2% of revenue earned from "all services not included in the solicitation of US SPV Afghanistan. These services include outbound airlift and road transport (deliveries from Kabul to customers not specified in the original solicitation) . . . ."   (Docket 17, ex. 1B at 49.)   During the exchange of emails, Orenstein clarified that airlift into Afghanistan ("Inbound Airlift Services") "while not part of the solicitation, will still attract 3.5%." Id.

The parties performed under the Services Agreement and the Side Agreement without dispute until November 2007. Around that time, news broke of a criminal investigation into PWC's procurement practices.   On March 26, 2008, following a dispute between the parties over PWC/PCA's refusal to supply pricing information to Supreme, Supreme gave notice of termination of the Services Agreement for

material breach, and ceased payment of the Monthly Service Fees.

## B.   THE INDICTMENT AND ARBITRATION

Article 12 of the Services Agreement provides that disputes shall be settled under the Rules of the AAA by a panel of three arbitrators.  Accordingly, on July 31, 2008, PWC/PCA filed a Notice of Arbitration with the AAA, alleging breach of the Servicing Agreement and seeking to recover unpaid Monthly Service Fees from December 2007 to March 2008 and Monthly Service Fees accrued thereafter.   In the alternative, PWC/PCA sought Post-Termination Fees if Supreme had properly terminated.    Supreme answered on September 17, 2008 that it had properly terminated because PWC/PCA had committed material breach by failing to provide pricing information upon request.  Supreme also argued that it did not owe any Post-Termination Fees for transportation services covered in the Side Agreement, which was a separate contract from the Services Agreement.

The Tribunal held a preliminary hearing on March 25, 2009 and set a schedule for arbitration.    The parties exchanged documents, filed written witness statements, and submitted expert reports and pre-hearing briefs.

On November 9, 2009 the United States unsealed a criminal indictment (the "Indictment") against PWC in the

United States District Court for the Northern District of Georgia.  The Indictment accused PWC of a "Major Fraud Against the United States" in connection with PWC's procurement and performance of its separate prime vendor contract in Zone 1.  (Id. at 15.)  In particular, the Indictment alleged that PWC had misrepresented its buying power for food items in its bid for the Zone 1 vendor contract.

Following the unsealing of the Indictment, Supreme filed a Second Amended Statement of Defense and Counterclaims, claiming for the first time that PWC/PCA had fraudulently induced it to enter into the Services Agreement "by making promises they intended to fulfill only by illegal means."  (Docket No. 17, ex. 1B at 15-16.) Thereafter, Supreme opposed, and the Tribunal denied, PWC/PCA's request for a stay of the arbitration during the criminal proceedings.  Supreme also sought the testimony of four PWC executives, including 1) Toby Switzer; 2) Stephen Lubrano, assistant general nanager; 3) Tarek Aziz Sultan Al-Essa, board chairman and managing director; and 4) Emad AlSaleh, deputy general manager (collectively, the "PWC Executives").

The Tribunal held two weeks of hearings in New York in February 2010.  Thirteen witnesses testified during the

hearings, including two experts and several PWC employees. However, the PWC Executives did not testify despite Supreme's request.  As the Tribunal later explained, "the missing PWC witnesses — while never actually asserting the Fifth Amendment privilege — quite clearly declined to appear to avoid answering questions under oath in arbitration that might in some way impact upon the pending criminal proceeding." (Docket No. 17, ex. 1B at 17.)

Following the hearings, the parties submitted post-hearing briefs, as well as additional calculations and letter-briefs related to damages calculations.   In its pre- and post-hearing briefs, Supreme argued that the PWC Executives' decision not to testify was fatal to PWC/PCA's claims.  Supreme contended that New York law[4] supported dismissal where material witnesses for the party making an affirmative case invoked the Fifth Amendment and refused to testify.  Supreme also urged the Tribunal to infer from the missing testimony that PWC had in fact defrauded the government, as alleged in the Indictment, and that it committed similar fraud in its dealings with Supreme. Finally, Supreme argued that PWC/PCA could not recover under the Services Agreement pursuant to McConnell v.

---

[4] Article 11 of the Services Agreement provides that the Services Agreement is to be governed and construed in accordance with the laws of New York. (Docket No. 17, ex. 2 at 11.)

Commonwealth Pictures Corp., 7 N.Y.2d 465 (N.Y. 1960), which stands for the proposition that a contract procured by bribery or other illicit means is unenforceable.

C.    THE AWARD

On April 26, 2011, the Tribunal issued its Partial Final Award, constituting a 56-page opinion and a 17-page partial dissent. The Tribunal concluded that although Supreme was entitled to terminate the Services Agreement because PWC/PCA had failed to provide pricing and vendor information, Supreme nonetheless owed PWC/PCA Monthly Service Fees through termination on March 26, 2008, and the reduced Post-Termination Fees thereafter. Arbitrator Milton Mollen ("Mollen") dissented from the majority, arguing that PWC/PCA's claims should be dismissed. The Tribunal unanimously denied Supreme's fraudulent inducement and rescission claims. The Final Award, dated August 25, 2011, incorporated the Partial Final Award and award PWC/PCA $38,660,021 in damages.

In formulating its ruling, the Tribunal majority spent a significant portion of the Partial Final Award addressing the issues associated with the missing testimony of the PWC Executives and Supreme's arguments on that front. While wary that "a party may not use the [Fifth Amendment] privilege as an instrument of attack," (Docket No. 17, ex.

8

1B at 25 (internal quotation marks omitted)), the Tribunal declined to dismiss PWC/PCA's claims as a result of the missing testimony of the PWC Executives, noting that "[t]he cases are rife with admonitions to the trier of fact not to penalize unduly a civil litigant who, in essence, is compelled to choose between mounting a defense or waiving the privilege." (Id. at 24.) Thus, the Tribunal concluded, "the mere absence of one or more witnesses . . . will not ipso facto determine an issue adversely to the party who declined to offer those witnesses if the weight of the evidence, taken as a whole . . . leads to a different conclusion." (Id. at 26.) The Tribunal reasoned that because the Indictment alleged misconduct for a different contract in a different geographical area (Zone 1) than the Services Agreement, little could be inferred regarding PWC/PCA's conduct in performing the Services Agreement.[5] The situation was distinguishable from McConnell, in which the accusation of bribery applied to the contract at issue, as the Tribunal stated: "The connection is simply too attenuated to permit the Tribunal

---

[5] The Tribunal pointed out that an Indictment is itself weak evidence of wrongdoing. Moreover, "[e]ven if, hypothetically, PWC were found guilty of the crimes with which they are charged, this would, even assuming the applicability of the Federal Rules of Evidence (which are not applicable in this arbitration), only constitute similar bad acts and not admissions requiring, or supporting, the entry of judgment in favor of Supreme." (Docket No. 17, ex. 1B at 23-24.)

to invoke McConnell to void an otherwise legal agreement."
(Id. at 38.)

Mollen's dissent focused in large part on the PWC
Executives' refusal to testify, stating that "Claimants'
course of conduct in the hearing of their claims can be
titled 'the Case of the Missing Witnesses.'" (Docket No.
17, ex. 1C at 1.). In voting to dismiss PWC/PCA's claims,
he noted the refusal of the PWC Executives to testify as
part of the reason for his dissent.

Rather than dismiss PWC/PCA's claims, the Tribunal
majority did make adverse inferences against PWC/PCA as a
result of the missing PWC Executives' testimony. For
example, the Tribunal inferred that PWC/PCA did not give
Supreme its best prices and vendor information; this led to
the conclusion that PWC/PCA breached the Services
Agreement. (Id. at 47-48 ("This is one area in which the
testimony of the missing witnesses can be deemed crucial .
. . PWC's failure to appear with knowledgeable witnesses
warrants an adverse inference.").) Since the Tribunal ruled
that Supreme properly terminated the Services Agreement,
Supreme owed the reduced Post-Termination Fees, rather than

the full Monthly Service Fee, for the period beginning March 26, 2008.[6]

With regard to the Side Agreement, the Tribunal adversely inferred that Swizer's testimony "would not have been helpful to PWC/PCA," (Id. at 52), and therefore rejected PWC/PCA's argument that the Side Agreement was an amendment to the Services Agreement, rather than a separate contract.  As a result, the Tribunal ruled that Supreme did not owe Post-Termination Fees for outbound transportation services included in the Side Agreement.  Nevertheless, the Tribunal found that Supreme did owe PWC/PCA Post-Termination Fees for Inbound Airlift Services because "the parties clearly agreed to treat the payment for such services as if they were [] included [in the Solicitation]." (Docket No. 17, ex. 1A at 7.)

## II.   LEGAL STANDARD

The role of a district court in reviewing an arbitral award is "narrowly limited," and "arbitration panel determinations are generally accorded great deference under the FAA." Tempo Shain v. Bertek, Inc., 120 F.3d 16, 19 (2d Cir. 1997); see Zeiler v. Deitsch, 500 F. 3d 157, 164 (2d Cir. 2007).  This deference promotes the "twin goals of

---

[6] PWC/PCA argues this adverse inference saved Supreme as much as $53 million in damages.  (See Docket No. 20 at 15.)

arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." Telenor, 584 F.3d at 405.   As a result, the burden of proof "required to avoid confirmation is very high," D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006), and a court will enforce the award unless the party seeking vacatur shows that the arbitrators failed to present a "barely colorable justification for the outcome reached." Rich v. Spartis, 516 F.3d 75, 81 (2d Cir. 2008) (quoting Landy Michaels Realty Corp. v. Local 32B-32J Serv. Emps. Int'l, 954 F.2d 794, 797 (2d Cir. 1992)).

A.   THE CONVENTION AND THE FAA

Supreme argues that the Award should be vacated under Convention Article V(2)(b) ("Article V(2)(b)"), and §§ 10(a)(3) and 10(a)(4) of the FAA.

Pursuant to the Convention and the FAA, a district court must confirm an arbitral award unless the party seeking vacatur establishes any of the limited exceptions listed in § 10(a) of the FAA or one of the grounds for refusal specified in the Convention.   See Hall Street Assocs., LLC v. Mattel, Inc., 552 U.S. 576 (2008); Telenor, 584 F.3d at 405.

The Convention lists seven grounds for denial of a confirmation, including if the "recognition or enforcement

12

of the award would be contrary to public policy . . . ."
Convention, art. V(2)(b).   "Article V(2)(b) [of the
Convention] must be 'construed very narrowly' to encompass
only those circumstances 'where enforcement would violate
our most basic notions of morality and justice.'"  Telenor,
584 F.3d at 411 (quoting Europcar Italia S.p.A. v.
Maiellano Tours, Inc., 156 F.3d 310, 315 (2d Cir. 1998)).

> The FAA provides for vacatur:
>
> 1) where the award was procured by corruption, fraud,
> or undue means; (2) where there was evident partiality
> or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in
> refusing to postpone the hearing, upon sufficient
> cause shown, or in refusing to hear evidence pertinent
> and material to the controversy; or of any other
> misbehavior by which the rights of any party have been
> prejudiced; or (4) where the arbitrators exceeded
> their powers, or so imperfectly executed them that a
> mutual, final, and definite award upon the subject
> matter submitted was not made.

9 U.S.C. § 10(a).   When a petitioner seeks to vacate an
arbitral award pursuant to FAA § 10(a)(3) based on an
evidentiary decision of the arbitrators, "except where
fundamental fairness is violated" that decision "will not
be opened up to evidentiary review"."  Rai v. Barclays
Capital, Inc., No. 10-3070-cv, 2011 WL 5176169, at *1 (2d
Cir. Nov. 2, 2011) (quoting Tempo Shain, 120 F.3d at 20).
With regard to § 10(a)(4), which applies when arbitrators
"exceed[] their powers," the Second Circuit has

"consistently accorded the narrowest of readings to the [FAA's] authorization to vacate awards [pursuant to § 10(a)(4)], especially where that language has been invoked in the context of arbitrators' alleged failure to correctly decide a question which all concede to have been properly submitted in the first instance." Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 220 (2d Cir. 2002) (quoting In re Andros Compania Maritima S.A., 579 F.2d 691, 703 (2d Cir. 1978)). Thus, regardless of whether the arbitrators properly decided an issue, a court will not vacate an arbitral award under § 10(a)(4) unless the petitioner can show that the arbitrators lacked the authority to reach that issue.

B.   MANIFEST DISREGARD FOR THE LAW

In addition to the explicit provisions of the Convention and the FAA, the Second Circuit has added a gloss on FAA § 10(a) which allows a district court to vacate where the award evidences "manifest disregard" of the law. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 548 F.3d 85, 91-92 (2d. Cir. 2008), rev'd on other grounds, --- U.S. ---, 130 S. Ct. 1758 (2010); T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010). Courts vacate awards on grounds of manifest disregard only in "those exceedingly rare instances where

some egregious impropriety on the part of the arbitrators is apparent." Stolt-Nielsen, 548 F.3d at 91-92 (quoting Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 389 (2d Cir. 2003)).

An arbitral award may be vacated based on manifest disregard of the law if: (1) the law that the arbitrators allegedly ignored was clear and "explicitly applicable to the matter before [them];" (2) "the law was in fact improperly applied, leading to an erroneous outcome;" and (3) the arbitrators knew of the law's existence and applicability, but intentionally disregarded it. T.Co Metals, 592 F.3d at 339 (quoting Duferco, 333 F.3d at 389-90).

## III. DISCUSSION[7]

### A.   THE MISSING WITNESSES

The decision of the PWC Executives not to testify is the focal point of Supreme's cross-petition for vacatur. Pursuant to Article V(2)(b) and FAA §§ 10(a)(3) and 10(a)(4), Supreme argues that the Award should be vacated because the Tribunal should have dismissed PWC/PCA's claims

---

[7] As a preliminary matter, the Court notes that although § 12.01 of the Services Agreement provides that any arbitral award is "final," "binding upon the parties," and "non-appealable," (Docket No. 17, ex. 2 at 11), such agreements are unenforceable in the Second Circuit. See Hoeft v. MVL Grp., Inc., 343 F.3d 57, 66 (2d Cir. 2003), overruled on other grounds, Hall Street Assocs., 552 U.S. 576. Supreme thus did not waive its right to appeal the arbitral award.

as a consequence of the PWC Executives' refusal to testify. Supreme asserts that this testimony would have been essential to its McConnell defense.   According to Supreme, the Award is therefore fundamentally unfair and undermines explicit New York public policy requiring dismissal of a party's affirmative claims where that party then asserts privilege.   In addition, Supreme argues that the Tribunal exceeded its powers and manifestly disregarded the law in declining to dismiss the claims after the PWC Executives' refused to testify.

    Supreme's argument turns on its assertion that, under New York law, "an action must be dismissed if the party seeking relief uses a privilege to refuse to testify about matters that may bear on a defense."   (Docket No. 17, at 18.)   New York courts do find claimants in default if they invoke the Fifth Amendment to avoid giving evidence, see, e.g., Laverne v. Incorporated Vill. of Laurel Hollow, 18 N.Y.2d 635, 638 (1966), in recognition that "the constitutional privilege against self incrimination should be used only as a shield and not as a sword."   Levine v. Bornstein, 174 N.Y.S.2d 574, 576 (N.Y. Special Term 1958). However, the imposition of this sanction is not mandatory, but falls within the court's inherent discretionary power. See, e.g., Castellana v. New York Herald Tribune, Inc., 253

16

N.Y.S.2d 507, 508-09 (N.Y. Special Term 1964) (staying proceedings and denying defendants' motion to dismiss where plaintiff, who was under indictment, claimed privilege against self-incrimination); Gold v. Rockville Centre Police Dep't, 896 N.Y.S.2d 391, 393 (App. Div. 2d Dep't 2010) (affirming denial of defendants' motion to dismiss where plaintiff in civil action invoked Fifth Amendment privilege while criminal charges were pending against him); N.Y. Jur. 2d § 423 (2011). Cf. Levine, 174 N.Y.S. 2d 574, (N.Y. Sp. Term 1958) (exercising court's "inherent power" to strike complaint where plaintiff asserted Fifth Amendment in refusing to testify). Lesser sanctions, such as an adverse inference, may instead be appropriate, since "[i]t is beyond cavil that an inference may be drawn against a witness in a civil proceeding because of his or her failure to testify, even where a constitutional privilege is invoked." Rauss v. Johnson, 647 N.Y.S.2d 135, 136 (App. Div. 3d Dep't 1997).

The Tribunal therefore did not act against explicit public policy or in manifest disregard of the law in deciding that it would "assess the evidence, or lack of it, as a whole" and reach a determination on the merits. (Docket No. 17, ex. 1B at 26.) See Commercial Risk Reinsurance Co. v. Security Ins. Co. of Hartford, 526 F.

Supp. 2d 424, 428 (S.D.N.Y. 2007) ("Arbitrators . . . possess broad latitude to determine the procedures governing their proceedings, to hear or not hear additional evidence, to decide what evidence is relevant, material, or cumulative, and otherwise to restrict the scope of evidentiary submissions."). As the Tribunal recognized, the PWC Executives were not asserting the privilege as a "sword" for purely tactical reasons, but were indeed under indictment. A stay of the arbitration during the criminal proceedings would have avoided the need for any witnesses to invoke the privilege, but Supreme opposed such a request. The Tribunal noted that "Supreme's insistence that the case be heard sooner rather than later helped to orchestrate the situation" in which the PWC Executives faced self-incrimination if they testifed. (Docket No. 17, ex. 1B at 25.)

Nor was PWC/PCA's behavior comparable to a case in which a party makes affirmative claims, but then refuses to produce any evidence. Well before Supreme sought the testimony of the PWC Executives, PWC/PCA had produced documents and witness statements, and several PWC employees testified during the hearing. As the Tribunal explained, the parties produced a "considerable amount of documentary

18

and testimonial evidence" with which to analyze the claims. (Docket No. 17, ex. 1B at 26.)

The Tribunal produced much more than a "barely colorable justification" for its decision.  In its lengthy Partial Final Award, the Tribunal analyzed New York and federal law on the issue of what to do about the missing testimony, (see id. at 20-26), and arrived at the careful conclusion that it would draw adverse inferences against PWC/PCA where appropriate.  The Tribunal examined the parties' evidence, including the Indictment, and drew adverse inferences against PWC/PCA in recognition of the PWC Executives' refusal to testify.  After weighing the evidence, including the adverse inferences, the Tribunal concluded that Supreme had failed to carry its burden to prove fraudulent inducement, largely because Supreme had not shown damages, and that McConnell did not render the Services Agreement unenforceable.  The Tribunal's rejection of the McConnell defense was reasonable given that case's requirement that "[t]here must at least be a direct connection between the illegal transaction and the obligation sued upon."  McConnell, 7 N.Y.2d at 471.  In raising the McConnell defense, Supreme was essentially "ask[ing] the Tribunal to punish PWC for its alleged criminal behavior in respect of a different government

contract," (Docket No. 17, ex. 1B at 38 (emphasis in original)), a connection the Tribunal found too attenuated.

In light of the Tribunal's well-reasoned opinion and the adverse inferences drawn on behalf of Supreme, there is no support for Supreme's arguments that the Tribunal's determination was fundamentally unfair, contrary to public policy, or in manifest disregard of the law.

Moreover, the Tribunal did not "exceed[] [its] powers." Supreme cites Stolt-Nielsen, 130 S. Ct. at 1768, to support its argument that the Tribunal exceeded its power by "fashioning [its] own policy" rather than "interpreting and applying an agreement." (Docket No. 16 at 18.) Unlike the circumstances involved in Stolt-Nielsen, in which the arbitration panel did not look to governing law but "proceeded as if it ha[d] the authority of a common-law court," id. at 1769, the Tribunal here worked within the framework of existing law to reach its conclusion. Since Supreme argues that the Tribunal improperly decided the issue of the missing testimony, but does not challenge the Tribunal's authority to reach that question in the first place, the Court will not vacate under § 10(b)(4). See DiRussia v. Dean Witter Reynolds, Inc., 121 F.3d 818, 824 (2d Cir. 1997) ("Our inquiry under § 10(a)(4) thus focuses on whether the arbitrators had the

20

power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue.").

B.    THE INBOUND AIRLIFT SERVICES FEES

Pursuant to FAA §§ 10(a)(3) and 10(a)(4), Supreme cross-petitions for vacatur of the Tribunal's award to PWC/PCA of Post-Termination Fees for Inbound Airlift Services.[8]    Supreme argues that the Tribunal rested its decision on a new contract theory, raised for the first time in the Final Award, that "the parties clearly agreed to treat the payment for [Inbound Airlift Services] as if they were [] included [in the Solicitation]." (Docket No. 17, ex. 1A at 7.)  Supreme argues it was prejudiced because it never had the opportunity to address this new contract theory, and therefore the Award is fundamentally unfair.[9]

In reaching its conclusion regarding the Inbound Airlift Services, the Tribunal examined the text of the

---

[8] According to Supreme, the Post-Termination Fees on the Inbound Airlift Services amount to $8 million in damages.

[9] Supreme also argues that the Tribunal exceeded its powers by straying from the "essence" of the Services Agreement.  However, the case law that Supreme cites addresses the Labor Management Relations Act, which the Second Circuit has found to be "analytically distinct" from the FAA.  Westerbeke, 304 F.3d at 222 (quoting Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers Union Local 812, 242 F.3d 52, 54 (2d Cir.2001)).    Moreover, whereas Supreme argues that the Tribunal found an impermissible unwritten modification to the Services Agreement, it appears from the text of the Final Award that the Tribunal was in fact discussing a modification to the Solicitation.  (See Docket No. 17, ex. 1A at 7.)    The Tribunal did not, therefore, "rewrite" the Services Agreement as Supreme contends.

Solicitation, the Side Agreement, and the Services Agreement, and evidence of the parties' intent, including the parties' course of performance. (See id. at 4-8.) The Tribunal's determination was therefore founded on basic tools of contract interpretation, the application of which courts usually will not review. See In re S.E. Atl. Shipping Ltd., 356 F.2d 189, 191-92 (2d Cir. 1996) ("Under our limited scope of review of arbitration awards, we are bound by the arbitrators' factual findings and by their interpretation of the contract."); T.Co Metals, 592 F.3d at 339 ("With respect to contract interpretation, this standard essentially bars review of whether an arbitrator misconstrued a contract."). Regardless of whether the Tribunal's decision relied on a "new" contract theory — and it is far from clear that it did — it was based on the same agreements and evidence that had always been at issue. Both parties were given ample opportunity to present arguments and testimony regarding the contracts. The idea that Supreme was somehow unfairly prejudiced or that the resulting Award was fundamentally unfair is therefore unpersuasive.

22

## IV.   <u>CONCLUSION</u>

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the petition (Docket No. 1) of petitioners Agility Public Warehousing Co. K.S.C. and Professional Contract Administrators, Inc. to confirm arbitration awards is **GRANTED**; it is further

**ORDERED** the motion (Docket No. 18) of respondent Supreme Foodservice GmbH for an order granting petition to vacate the arbitral award is **DENIED**.


**SO ORDERED.**

Dated:   New York, New York
         29 December 2011

                                        _____
                                           VICTOR MARRERO
                                              U.S.D.J.